511 A.2d 461

**STATE of Maryland**

v.

**James Arthur CALHOUN.**

**No. 104, Sept. Term, 1985.**

Court of Appeals of Maryland.

July 15, 1986.

Motion for Reconsideration Denied Aug. 21, 1986.

696

Richard B. Rosenblatt, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellant.

Robert E. Morin (Joseph P. Suntum, Office of the Public Defender, on brief), Rockville, for appellee.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

SMITH, Judge.

James Arthur Calhoun was convicted by a Montgomery County jury of first degree, premeditated murder in the death of Philip Metz (principal in the first degree), murder in the first degree (felony murder) in the death of David Myers (principal in the second degree), attempted murder of Douglas Cummins, two violations of the handgun law, robbery with a deadly weapon, and storehouse breaking. A jury sentenced him to death for the murder of Metz. In *Calhoun v. State,* 297 Md. 563, 468 A.2d 45 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984), we affirmed the convictions and the death sentence.

Pursuant to the provisions of Maryland Code (1957, 1982 Repl. Vol., 1985 Cum.Supp.) Art. 27, §§ 645A–J, the Uniform Post Conviction Procedure Act, Calhoun filed a petition for post-conviction relief in the Circuit Court for Montgomery County. The court affirmed Calhoun's convictions but ordered a new sentencing proceeding based upon its finding of an erroneous allocation of the burden of proof in

the trial court's instruction to the jury and the failure of the court to offer Calhoun an opportunity for allocution prior to the jury's deliberating on the sentence. We granted leave to both the State and Calhoun to appeal. On the State's appeal we shall reverse. We shall affirm on Calhoun's appeal.

## I THE STATE'S APPEAL

### (A) THE JURY INSTRUCTION

■ The trial judge opened his instructions by telling the jury, "The death sentence may not be imposed unless you unanimously agree that the aggravating factors outweigh the mitigating factors." At the conclusion of his instruction, he said in relevant part:

"If you find by preponderance of the evidence that the mitigating factors—again, not numerically but—obviously I'm saying you could have all the aggravating factors and find that one mitigating factor could outweigh all of them. Or you could have one aggravating factor and numerous mitigating factors; but if you found that all of the mitigating factors together did not by a preponderance of the evidence outweigh the aggravating factor, then that would be your determination. If you find that the mitigating factors outweigh the aggravating factors, then you go to the fourth section and enter life imprisonment. If you find that the mitigating factors do not by a preponderance of the evidence outweigh the aggravating factors, then you mark that accordingly and proceed to Section 4 and enter a sentence of death."

The post-conviction judge said that "the instruction by the trial judge to the jury pursuant to Art. 27, Sec. 413(h)(2) that 'if it finds that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death' improperly stated the burden of persuasion."

Code (1957, 1982 Repl. Vol.) Art. 27, § 413(h)(2) states relative to the sentencing authority, jury or court, "If it finds that the mitigating circumstances do not outweigh the

aggravating circumstances, the sentence shall be death." Subsection (h)(3) states, "If it finds that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life." It will be noted that the instruction given is virtually in the words of the statute.

In *Foster v. State,* 304 Md. 439, 479, 499 A.2d 1236, 1257 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986), Judge Eldridge said for the Court, "[W]e adhere to our prior holdings that the burden of persuasion for purposes of § 413(h) is upon the prosecution." In *Evans v. State,* 304 Md. 487, 537 n. 18, 499 A.2d 1261, 1287 n. 18 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986), we said, "[W]e held in *Foster,* 304 Md. at 479, 499 A.2d at 1256–1257, that the language of § 413(h) does not place any burden or risk upon the accused." In *Foster, Evans and Huffington v. State,* 305 Md. 306, 318, 503 A.2d 1326, 1332 (1986), we said, "[A]s indicated in the *Evans* opinion, *id.* at 537 n. 18, 499 A.2d 1261, the instruction was not erroneous because the 'language of § 413(h) does not place any burden or risk upon the accused.' "

The instruction here was in the language of the statute. Hence, there was no error on the part of the trial judge.

## (B) DENIAL OF THE RIGHT OF ALLOCUTION

■ In his petition for post-conviction relief Calhoun alleged:

"Petitioner was denied his right guaranteed under Art. 27 Section 413(c)(2), then Maryland Rule 772(a); the Maryland Declaration of Rights, and the Fifth, Eighth and Fourteenth Amendments, to allocute at his sentence.

"Petitioner was never advised by counsel or the trial court of his unrestricted right to allocute before his sentencing jury. Such a right is fundamental to all criminal defendants, particularly those whose lives hang in the balance. Consequently, he was deprived of his

right to do so. Moreover, the failure of the State to adhere to its own law and procedure denied petitioner his right to due process of law and a reliable sentencing procedure.

"Furthermore, not only is allocution mandated by rule for all non-capital defendants but the practice in Maryland has been to allow allocution by other capital defendants sentenced pursuant to the same procedural rules and statutes as the petitioner. Such discrimination in the allowance of allocution denied the petitioner equal protection of the laws and results in the arbitrary application of the death penalty."

The post-conviction judge said:

"The defendant had not testified during the first phase; nor did he *testify* in the second phase. As apparently his trial counsel viewed defendant's right to speak only in the context of 'testimony,' defendant was not presented by counsel with a decision as to whether he would allocute. The trial judge did not ask defendant if he wished to allocute before the jury. The defendant did not allocute. As a consequence, the jury faced with a life versus death decision retired to consider the defendant's fate having before it the commission of savage crimes (savagery is found here in the execution style premeditated killing of a uniformed police officer by a masked thief fully armed) a prior criminal record of violence, certain evidence questionably admitted tending to show defendant's violent propensities as a prisoner in custody, a minimal amount of evidence in mitigation *and without ever hearing the defendant speak.* After looking for days upon a black man of large stature and build who according to his counsel (as well as to the observation of this court) appears outwardly 'scary,' 'menacing,' 'cold,' and with 'a lack of emotion', the all-white jury retired having little more before it on the other side of a difficult equation it was asked to balance beyond the spectre presented by the

defendant's appearance." (Reference to transcript omitted. Emphasis in original.)

The post-conviction judge concluded:

"The Maryland Rules presently in effect which require that defendants in sentencings hearings in both capital and non-capital cases be asked on the record by the trial court whether the right of allocution is desired seem to treat the right of allocution as fundamental. More importantly, the facts in this case and the significance of the right of allocution to the defendant here suggest strongly the only possible answer that can be given. This court holds that the history of the right of allocution and its significance to a defendant—never more important than it is today under the procedure in capital sentencing cases—results in this right being fundamental—so fundamental that only the defendant—not his counsel—can waive the right. It follows that this defendant who was never advised of his right to allocution can not have waived such right.

"The sentencing procedure utilized here in that it denied the defendant his fundamental right to allocute before the sentencing jury was defective. The sentencing portion of the defendant's trial can not stand."

Code (1957, 1982 Repl. Vol.) Art. 27, § 413(c)(2) provides, "The State and the defendant or his counsel may present argument for or against the sentence of death." In *Harris v. State*, 306 Md. 344, 349, 509 A.2d 120, 122 (1986) Chief Judge Murphy said for the Court, "[A]llocution is neither synonymous with nor encompassed by the term 'argument' ...." In *Harris* the Court said:

"By chapter 3 of the Acts of 1978, effective July 1, 1978, the General Assembly enacted § 413, the present capital sentencing statute. In response to this enactment, the Court adopted Md. Rule 772A, which substantially tracked the language of § 413 and applied only to capital sentencing proceedings. The rule did not contain any provision as to allocution. The Court also amended Md. Rule 772 to apply only to noncapital cases.[5]

"Between January 1, 1979, and July 1, 1984, the Maryland Rules did not afford defendants in capital cases a right of allocution. It was during this period that Harris was sentenced to death. The right of allocution in capital cases was not again addressed in the Maryland Rules until the adoption of current Rule 4–343 as part of the comprehensive revision of the rules in 1984.[6] Rule 4–343, which superceded Md. Rule 772A, provides in subsection (d), entitled 'Allocution,' that in capital cases, '[b]efore sentence is determined, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement.'

---

[5] Md. Rule 772A was adopted and Md. Rule 772 was amended effective January 1, 1979.

[6] Rule 4–343 became effective on July 1, 1984." 306 Md. at 353, 509 A.2d at 124.

Calhoun was sentenced during this hiatus in the rules. However, in *Harris* the Court said:

"[W]hen Md. Rule 772 was amended to apply only in noncapital cases, thereby removing capital cases from the purview of its allocution provision, the right of allocution in capital cases reverted to the common law of Maryland." 306 Md. at 353, 509 A.2d at 124.

The Court concluded in *Harris:*

"We conclude that, under the common law applicable to capital sentencing proceedings at the time Harris was sentenced, a defendant who timely asserts his right to allocute, and provides an acceptable proffer, must be afforded a fair opportunity to exercise this right. If the right so asserted is denied by the court, as here, the sentence must be vacated and a new sentencing proceeding conducted." 306 Md. at 359, 509 A.2d at 127.

It is conceded that Calhoun made no request for allocution in the trial court. The post-conviction statute (Code 1957, 1982 Repl. Vol.) Art. 27, § 645A(c) provides:

"(c) *When allegation of error deemed to have been waived.*—For the purposes of this subtitle, an allegation of error shall be deemed to be waived when a petitioner

could have made, but intelligently and knowingly failed to make, such allegation before trial, at trial, on direct appeal (whether or not said petitioner actually took such an appeal), in any habeas corpus or coram nobis proceeding actually instituted by said petitioner, in a prior petition under this subtitle, or in any other proceeding actually instituted by said petitioner, unless the failure to make such allegation shall be excused because of special circumstances. The burden of proving the existence of such special circumstances shall be upon the petitioner."

In *Curtis v. State*, 284 Md. 132, 395 A.2d 464 (1978), Judge Eldridge discussed this statute for the Court. The Court concluded:

"[W]e believe that the Legislature, when it spoke of 'waiver' in subsection (c) of Art. 27, § 645A, was using the term in a narrow sense. It intended that subsection (c), with its 'intelligent and knowing' standard, be applicable only in those circumstances where the waiver concept of *Johnson v. Zerbst* [, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938),] and *Fay v. Noia* [, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963),] was applicable. Other situations are beyond the scope of subsection (c), to be governed by case law or any pertinent statutes or rules. Tactical decisions, when made by an authorized competent attorney, as well as legitimate procedural requirements, will normally bind a criminal defendant." 284 Md. at 149–50, 395 A.2d at 474.

In *Harris* Chief Judge Murphy said for the Court:

"[B]ecause the right of allocution is not a fundamental right secured by either the federal or state constitution, it is waived if not asserted by the defendant before sentencing. *See Logan v. State*, 289 Md. 460, 487, 425 A.2d 632 (1981); *Robinson v. Warden*, 242 Md. 171, 172–73, 218 A.2d 217 (1966); *see also Hill v. United States*, 368 U.S. 424, 428, 82 S. Ct. 468 [471], 7 L.Ed.2d 417 (1962). This principle of waiver is equally applicable to the common law right of allocution, and supercedes the 'actual or

potential injury' standard of *Dutton* [*v. State,* 123 Md. 373, 91 A. 417 (1914) ]." 306 Md. at 357, 509 A.2d at 126.[1] We deem the point waived. Hence, Calhoun is not entitled to post-conviction relief on this issue.

## II CALHOUN'S APPEAL

### (A) NEELEY'S GRAND JURY TESTIMONY

■ This case was tried before our decision in *Jones v. State,* 297 Md. 7, 464 A.2d 977 (1983), where we held that "after a State's witness has testified on direct examination, a defendant is entitled to inspect the grand jury testimony for cross-examination purposes without any requirement that he show any other need." On the motion for reconsideration we said:

"Because this case does not involve any change in the Maryland law, a defendant's failure to demand an available grand jury transcript, and to preserve an objection to the trial court's failure to require its production, clearly implicates the waiver provisions of *Curtis v. State,* 284 Md. 132, 145–150, 395 A.2d 464 (1978)." 297 Md. at 25, n. 1, 464 A.2d at 985, n. 1.

On this issue the post-conviction judge said:

"During a hearing on October 5, 1981, on pre-trial motions, the trial court declined to require the state to disclose the identity of one grand jury witness whose testimony was likely to be offered at trial. During the argument and colloquy, defendant's counsel fully protected the record *at that point* by requesting the name and the grand jury testimony of that witness. The court's rulings are embodied in the following two separate excerpts from pp. 22 and 23 of the transcript:

'THE COURT: I will order the name be divulged to the Court and, which I will not look at until it becomes at issue in the trial, and by at issue I don't mean it's

---

**1.** We hasten to point out that the post-conviction judge did not have the benefit of our opinion in *Harris.*

necessary for counsel to put it in issue by requesting it for impeachment.'

———

'THE COURT: I'll reserve ruling on the motion to produce at this time. I will, however, order that that transcript be prepared of the testimony—do you want the testimony of Miss Lawson also?'

"The name of the witness was Audrey Neeley and she did in fact testify at trial. She was a young lady nineteen years of age who had kept frequent company with petitioner on the days prior to as well as after the date on which the crimes charged here were committed. Her testimony related, among other matters, to the petitioner having constantly carried a pistol prior to the date of the crimes but not afterwards, to petitioner's sudden acquisition of a large sum of money and the shopping excursion that then ensued, and to petitioner's concern that the police were after him to the extent that he left his apartment and took up residence with the witness at her apartment for several days. The trial transcript fails to dislose Audrey Neeley was ever identified to petitioner's counsel as the 'mystery' grand jury witness. Indeed it is conceded by the state that she was never so identified. No transcript of this witness' grand jury testimony was furnished to petitioner's counsel. No reference was made by the state or by the court to her grand jury testimony. In the light of what had transpired at the pre-trial hearing, this failure to call attention at trial to Audrey Neeley as the heretofore unnamed person who had testified before the grand jury was error. However, error though it was, it was not reversible error.

"The first difficulty was that of the trial court in making a temporizing ruling which not only was not self executing but which to the contrary invited the very slippage through the cracks which so obviously occurred here. The second problem was caused by the state. It had an affirmative responsibility to call the attention of

the court and defense counsel to Audrey Neeley in the context of her role as a grand jury witness *prior* to the time she testified at trial. The third mistake was made by petitioner's trial counsel in failing to raise the issue during the trial. It may be that the court's words during the pre-trial hearing were sufficient to lull petitioner's counsel into a sense of security (although this is quite debatable), but when the state rested and no 'mystery' witness had been identified and no grand jury transcript had been forthcoming, there was no longer any basis for security; and at least by then, if not sooner, alarms should have gone off and petitioner's counsel should have been on their feet raising the matter for the court's attention. At that point, the witness could have been identified, her grand jury testimony made available to petitioner's counsel and the witness could have been recalled by the state or by the court to be made available for additional cross-examination, if desired. While a close call, this court here holds that the failure of petitioner's trial counsel to so call the matter to the court's attention resulted in a waiver of this claim." (Emphasis in original. One transcript reference deleted.)

We think the trial judge was correct here in finding waiver. Moreover, counsel was not obliged to anticipate our decision in *Jones*.

### (B) FAILURE TO EXCUSE CALHOUN FROM THE COURTROOM

■ Calhoun argues that the trial court denied him due process when it refused to allow him to excuse himself from the courtroom during the testimony of Douglas Cummins, the only eyewitness to the crime, because it resulted in his view in an unreliable and suggestive courtroom identification.

The facts reveal that no line-up was ever held. However, on April 6 Cummins was shown a group of seven photographs. We said in *Calhoun:*

"At first he said he could not identify anyone. Later he touched the photograph of Calhoun and said that the shape of the head was very similar to that of the taller of his assailants but that he would be better able to tell if he had a full view of the person. Subsequently, he tapped Calhoun's photograph and said that of the seven, 'that's who I'd put my money on.' " 297 Md. at 575, 468 A.2d at 50.

A hypnotic interview of Cummins was conducted by the police on April 13. We pointed out in *Calhoun,* where there was an attack upon Cummins' testimony on the basis of hypnosis, that "[h]is posthypnotic testimony at the hearing on the motion to suppress was consistent with the interviews." 297 Md. at 575, 468 A.2d at 50. We said:

"It was clearly demonstrated that the Cummins and Adcock testimony did not depend upon hypnosis. Cummins identified Calhoun's photograph prior to hypnosis. Even if he had made no courtroom identification of Calhoun his extra-judicial identification would have been admissible in evidence. *Bedford v. State,* 293 Md. 172, 177, 443 A.2d 78 (1982); *Johnson v. State,* 237 Md. 283, 291, 206 A.2d 138 (1965)." 297 Md. at 578, 468 A.2d at 51.

At trial the judge overruled Calhoun's request to absent himself from the courtroom during Cummins' testimony. The prosecution initially said there would be no in-court identification. However, Cummins identified Calhoun at the express request of the court at trial.

The post-conviction judge said:

"It is the petitioner's contention that the trial court erred in denying his 'right' to remove himself from the courtroom to avoid an in-court identification. The short answer to this contention is that the petitioner had no such 'right.' While other procedures short of petitioner leaving the courtroom were available to avoid or reduce the suggestive nature of an in-court identification, the petitioner made no such requests. In *McKnight vs. State,* 33 Md. App. 280, 286–287 [364 A.2d 116] (1976)

reversed on other grounds, 280 Md. 604 [375 A.2d 551] (1977) the Court of Special Appeals stated:

'Appellant next urges that the trial court abused its discretion in denying his request to be seated in the audience for the in-court identification. He contends that in order to insure due process, it is incumbent on the state to produce evidence of a reliable and untainted identification prior to trial or that the court where no such evidence is forthcoming insure the defendant a fair and impartial in-court identification free from the suggestive effect of the defendant's being seated at the trial table next to defense counsel. We know of no such duty on the part of either the state or the court, and appellant cites no authority to support his position. 'This court has held that an accused has no constitutional right to be placed in a lineup. *Bowen v. State*, 5 Md.App. 713, 149 [249] A.2d 499 (1969). It has also been held that the conduct and direction of a trial is always within the sound discretion of the presiding judge. *Cummings v. State*, 7 Md. App. 687, 256 A.2d 894 (1969). In *Alston v. State*, 11 Md. App. 624, 629, 276 A.2d 225, 228 (1971), this court considered a similar request. The court at 629–630 [276 A.2d 225] said:

"Although such practices as seating an accused in the audience at his trial for purposes of identification are widely used and approved, the propriety, however, of various in-court identification techniques are still tied to the rule that the overall conduct of a trial is subject to the sound discretion of the trial judge. Moreover this court will not interfere with that discretion unless the trial judge clearly abuses it and, as a result the accused is prejudiced. *Turner v. State*, 7 Md. App. 74 [253 A.2d 777]."

'In denying appellant's motion, the trial court called attention to the fact that there were only two or three other individuals in the courtroom at the time of trial and that they were individuals closely resembling the defendant and were apparently brought there for the

purpose of misleading the jury. Under questioning, defense counsel admitted having requested their presence, "to see if the complaining witness could identify the defendant if he was not seated at the counsel's table."

'We hold that the trial court did not abuse its discretion and acted fully within its judicial prerogative in not permitting the in-court identification to become a game of judicial Russian roulette. See *White v. State,* 23 Md. App. 151, 158, 216 [326] A.2d 219 (1974).'

"The matter of in-court identification and the procedure therein utilized was within the sound discretion of the trial court. The record here fails to reveal an abuse of discretion.

"Petitioner's request to absent himself from the trial was made by counsel on the record. It was available for review by appellate counsel who read the entire record. The failure to raise the claim on appeal results in this claim being waived."

The post-conviction judge did not err in finding waiver and no abuse of discretion.

### (C) UNDERREPRESENTATION OF BLACKS IN JURY POOLS

■ In the post-conviction court Calhoun asserted that blacks were underrepresented in jury pools in Montgomery County.

In addressing the merits, the post-conviction judge said:

"Petitioner alleges that he has established a baseline or prima facie case that blacks were underrepresented in the jury pool. He points to the testimony of a statistical expert, Professor Richard Seltzer of Howard University, as establishing to a reasonable degree of statistical certainty that the relative or comparative disparity of blacks in the general population as compared to those in the jury pool was 41.6%. He claims he has established a systematic underrepresentation of blacks that results in a denial of equal protection of the law as well as a violation of the

Sixth Amendment to the Federal Constitution. He stresses the Sixth Amendment right because he maintains that lack of an intent to achieve underrepresentation is totally irrelevant to the inquiry. He suggests that the matter is one purely of statistical inquiry devoid of any considerations of constitutional balance or of consequences (either the statisticians are satisfied or they are not). While the petitioner cites many authorities, none go so far as to support petitioner's contentions based upon the facts in evidence here.

"The only suggestion made by petitioner for changing the present system of calling jurors using the voter rolls was to supplement the voter rolls with motor vehicle registration lists. Yet, there was no definitive showing as to how utilization of the motor vehicle registration lists would impact upon representation in the jury base.

"Of far greater importance, though, is the reasoning engaged in by Professor Seltzer in reaching his expressed opinion. The processing of jury questionnaires by the office of the Jury Commissioner for Montgomery County from 1979 through October 1983 disclosed that of 53,429 persons summonsed for jury service, 41,850 were white; 2,083 were 'Negroid'; 615 were Oriental; 101 were Spanish American; 73 were American Indian; and 9,707 were 'other' or did not reply to the race question. Solely by arbitrarily assuming that the 9,707 in the 'other' category would divide numerically by percentage in a given way the jury response by blacks was determined to be 4.66%. Thus, it was concluded that 4.66% of the persons in the jury pool were black. Census data showed that of the 424,742 persons in Montgomery County over 18 years of age, 33,896 or 7.98% were black. No effort was made to determine how many of the 33,896 blacks living in Montgomery County, a bedroom community for the nation's capital, were foreign affiliated non-citizens and thus not eligible for jury service. The comparison of 4.66% to 7.98% was used to reach the conclusion of underrepresentation, the disparity being stated to be 41.6%. Because the 9,707 persons (18.17%) who either gave no response or

who responded 'other' is such a large and hence statistically significant number when compared with the other numbers used any substantial variation from the unsupported assumption relating to the racial breakdown of the 9,707 persons collapses the conclusion reached of underrepresentation as with a house of cards. Indeed, any substantial increase in the number of blacks in such group can achieve either full proportional representation or even overrepresentation statistically. The data fails to support the opinion given, and on the merits petitioner has failed to make out a prima facie case of underrepresentation."

Claims of underrepresentation of distinctive groups in the jury selection process have been presented on equal protection grounds (14th Amendment), as in *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), and under the right to a fair cross-section of the community (guaranteed by the 6th Amendment) as in *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), Justice White said for the Court:

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." 439 U.S. at 364, 99 S. Ct. at 668, 58 L. Ed. 2d at 586–87.

In *Colvin v. State*, 299 Md. 88, 103–07, 472 A.2d 953, 960–62, *cert denied*, —— U.S. ——, 105 S.Ct. 226, 83 L. Ed.2d 155 (1984), we examined Code (1973, 1980 Repl. Vol., 1983 Cum. Supp.), §§ 8–201 to –208, Courts and Judicial Proceedings Article and its provision for random selection of jurors from voter registration lists in connection with an allegation that there was discrimination in the selection of

Anne Arundel County juries. There was a contention there
that the trial judge committed error by relying on our
ruling in *Wilkins v. State,* 270 Md. 62, 310 A.2d 39 (1973),
*cert. denied,* 415 U.S. 992, 94 S.Ct. 1592, 39 L.Ed.2d 889
(1974), that the selection of jurors from voter registration
lists was constitutional. Judge Couch said for the Court:

"The use of voter registration lists is designed to produce
an array which is a representative cross-section of the
community. This official means of selecting prospective
jurors is not unconstitutional even when it may have
some racially disproportionate impact. *See Castaneda v.
Partida,* [430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498
(1977)], and *Swain v. Alabama,* [380 U.S. 202, 85 S.Ct.
824, 13 L.Ed.2d 759 (1965)]. In order to establish a prima
facie case of discrimination the party asserting such must
show that the use of those lists resulted in purposeful dis-
crimination." 299 Md. at 106, 472 A.2d at 962. (Footnote
omitted.)

We concluded:

"Appellant has neither established an abuse in implemen-
tation of the selection system nor systematic exclusion.
Without more it cannot be said that Negroes have been
excluded from the venire to such a degree to establish a
prima facie case of racial discrimination." 299 Md. at
107, 472 A.2d at 962.

We reiterated our holding in *Colvin* and refused again to
reexamine the holding in *Wilkins* in *Lodowski v. State,* 302
Md. 691, 700–02, 490 A.2d 1228, 1232–33 (1985), *vacated
and remanded on other grounds,* —— U.S. ——, 106 S.Ct.
1452, 89 L.Ed.2d 711 (1986).

We conclude that the post-conviction judge did not err
when he concluded that Calhoun "ha[d] failed to make out a
prima facie case of underrepresentation."

### (D) DEATH QUALIFIED JURY

 Calhoun contends that death qualification during voir
dire resulted in an unconstitutionally prosecution-prone
jury.

In *Foster,* 304 Md. at 453, 499 A.2d at 1243, we rejected on the merits Foster's argument "that, in a capital murder prosecution, the exclusion of prospective jurors so opposed to capital punishment that their impartiality would be affected, deprives a defendant of his or her constitutional right to an impartial jury at the guilt or innocence phase of the trial." See also *Booth v. State,* 306 Md. 172, 192, 507 A.2d 1098, 1108 (1986), and *Grandison v. State,* 305 Md. 685, 727, 506 A.2d 580, 601 (1986).

The issue has just been addressed by the Supreme Court in *Lockhart v. McCree,* 476 U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The Court opened the opinion by saying it addressed the question left open by its decision nearly eighteen years ago in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968):

"Does the Constitution prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial?" 476 U.S. at ——, 106 S.Ct. at 1760, 90 L.Ed.2d at 142.

The Court referred to "the six studies introduced by McCree that at least purported to deal with the central issue in this case, namely, the potential effects on the determination of guilt or innocence of excluding '*Witherspoon*—excludables' from the jury ...." 476 U.S. at ——, 106 S.Ct. at 1763, 90 L.Ed.2d at 146. Justice Rehnquist said for the Court:

"Having identified some of the more serious problems with McCree's studies, however, we will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'convictionprone' than 'non-death-qualified' juries. We hold, nonetheless, that the Constitution does not prohibit the

States from 'death qualifying' juries in capital cases."
476 U.S. at ——, 106 S.Ct. at 1764, 90 L.Ed.2d at 147.

The Court further stated:

"We remain convinced that an extension of the fair cross-section requirement to petit juries would be unworkable and unsound, and we decline McCree's invitation to adopt such an extension.

"But even if we were willing to extend the fair cross-section requirement to petit juries, we would still reject the Eighth Circuit's conclusion that 'death qualification' violates that requirement. The essence of a 'fair cross-section' claim is the systematic exclusion of 'a "distinctive" group in the community.' *Duren* [*v. Missouri,* 439 U.S. 357,], 364 [, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)]. In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the '*Witherspoon*-excludables' at issue here, are not 'distinctive groups' for fair cross-section purposes.

"We have never attempted to precisely define the term 'distinctive group,' and we do not undertake to do so today. But we think it obvious that the concept of 'distinctiveness' must be linked to the purposes of the fair cross-section requirement. In *Taylor* [*v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)], we identified those purposes as (1) 'guard[ing] against the exercise of arbitrary power' and ensuring that the 'commonsense judgment of the community' will act as 'a hedge against the overzealous or mistaken prosecutor,' (2) preserving 'public confidence in the fairness of the criminal justice system,' and (3) implementing our belief that 'sharing in the administration of justice is a phase of civic responsibility.' *Id.,* at 530–531 [95 S.Ct. at 698]."
476 U.S. at ——, 106 S.Ct. at 1765, 90 L.Ed.2d at 148–49.

The Court further observed:

"The group of '*Witherspoon*-excludables' involved in the case at bar differs significantly from the groups we have previously recognized as 'distinctive.' 'Death qualification,' unlike the wholesale exclusion of blacks, women, or Mexican-Americans from jury service, is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial. There is very little danger, therefore, and McCree does not even argue, that 'death qualification' was instituted as a means for the State to arbitrarily skew the composition of capital-case juries.

"Furthermore, unlike blacks, women, and Mexican-Americans, '*Witherspoon*-excludables' are singled out for exclusion in capital cases on the basis of an attribute that is within the individual's control. It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law. Because the group of '*Witherspoon*-excludables' includes only those who cannot and will not conscientiously obey the law with respect to one of the issues in a capital case, 'death qualification' hardly can be said to create an 'appearance of unfairness.' " 476 U.S. at ——, 106 S.Ct. at 1766, 90 L.Ed.2d at 149–50. (Footnotes omitted.)

The Court concluded:

"[T]he Constitution presupposes that a jury selected from a fair cross-section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case. We hold that McCree's jury satisfied both aspects of this constitu-

tional standard." 476 U.S. at ——, 106 S.Ct. at 1770, 90 L.Ed.2d at 154–55.

Accordingly, we reject this argument.

## (E) ALLEGED INADEQUATE VOIR DIRE, FAILURE TO SEQUESTER THE JURY DURING VOIR DIRE, AND FAILURE TO SEQUESTER THE JURY

■■■ The brief of Calhoun asserts that prior to questioning his attorneys had requested individually sequestered voir dire and that later at trial counsel requested that the jury be sequestered.

On these issues the post-conviction judge said:

"The individual voir dire of each juror conducted away from the presence of the balance of the array is a permitted but not required procedure. Although such a request was made by defense counsel, the matter remained one within the sound discretion of the trial court. Likewise, the determination not to sequester the jury during trial proceedings was a decision made by the trial court in exercising its discretion. No circumstances were offered in evidence to show that the trial court erred in so exercising its discretion. No circumstances were offered to show on what occasions and in what matter the petitioner sustained prejudice as a result of the rulings of the trial court. Petitioner's claim is rejected on its merits. There was no abuse of discretion.

"Appellate counsel read the entire trial transcript. The requests made by defense counsel and the actions taken by the trial court were not the subjects of appeal. As such they were waived. This court holds that the doctrine of waiver is clearly applicable to these two different but related claims."

Calhoun points to no questions he desired on voir dire that were not asked. We agree that the issues were waived. Moreover, the examination on voir dire was in accordance with Rule 752 (now Rule 4–312) applicable to this proceeding and our interpretation of it in *Colvin*, 299

Md. at 101–03, 472 A.2d at 959–60. The issue of whether to sequester the jury was left by then Rule 543 a 8 (now Rule 2–511) to the discretion of the trial court. We find no error.

### (F) PROSECUTOR'S CLOSING ARGUMENT AT THE GUILT/INNOCENCE PHASE OF THE TRIAL

■ Calhoun refers to certain portions of the closing argument and asserts, "A criminal defendant is entitled to relief when it is demonstrated that a prosecutor's argument was so egregious as to render the trial fundamentally unfair." He takes issue with five specific portions of the argument which we shall discuss seriatim. The post-conviction judge said:

"Taken individually and as a whole, the prosecutor's statements were fair and accurate comment.

"The failure to object at trial results in waiver.

"The failure to raise the issue on appeal results in waiver."

As to closing argument Judge O'Donnell said for the Court in *Wilhelm v. State*, 272 Md. 404, 326 A.2d 707 (1974):

"As to summation, it is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way. Moreover, if counsel does not make any statement of fact not fairly deducible from the evidence his argument is not improper, although the inferences discussed are illogical and erroneous. Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the

accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the [prosecution] produces. *See* 23A C.J.S. *Criminal Law* § 1093 (1961). *See also Cicero v. State,* 200 Md. 614, 92 A.2d 567 (1952); *Meyerson v. State,* 181 Md. 105, 28 A.2d 833 (1942); 6 J. Wigmore, Evidence § 1806 (3d ed. 1940)." 272 Md. at 412–13, 326 A.2d at 714.

We have carefully examined each of the allegations of error and fully agree with the post-conviction judge that the argument did not exceed proper bounds. Moreover, as the post-conviction judge noted, there is waiver because of the failure to object at trial and the failure to raise the issue on appeal.

*1*

 Calhoun alleged in his petition for post-conviction relief:

"The prosecutor played to and attempted to influence the passions of the jury by asking them to render a guilty verdict because of the heinous nature of the crime. The prosecutor implored the jury:

One final concept that I think is very important and should be mentioned before I get into the actual facts is that in a courtroom, lawyers tend to speak in abstract legal concepts. Witnesses tend to speak, especially expert witnesses, in clinical terms. Over a course of time a trial takes on a very antiseptic appearance; we tend to push out the gravity of the crime because we don't want to face it. But I think we all should recall what we're dealing with here and what we're dealing with is that on March 27, 1981, the lives of two men, two young men, were snuffed out. David Meyers and Phillip Metz, one of them 30, one of them 33. It was snuffed out in a horrible crime, one that should affect the conscience of every decent human being."

We do not believe this to have exceeded the bounds of fair comment.

### 2

■ Calhoun further alleged in his petition for post-conviction relief:

"Prosecutor improperly argued that the fact that the State's primary witness, Herbert Smallwood, who testified in accordance with an extremely advantageous plea agreement, did not have a prior criminal conviction for a violent crime using a weapon, was probative of the State's contention that Smallwood did not participate in the shooting. The prosecutor stated:

You heard the impeachment of Mr. Smallwood, heard about prior burglaries, but I ask you did you hear about one prior violent crime using a weapon? Did you hear of any violent crime, any armed robberies, any murders? And is there a shred of evidence in this case that Mr. Smallwood had a gun or in fact is it the opposite? Did Smallwood tell you that he was offered a gun by Calhoun and he refused it? And did Smallwood further tell you he was to be one of the men inside in the beginning, but he backed out, he didn't want any part of going in that store? He admitted after the initial attempt to burglarize Bell, and he did say that they were going for a burglary the first time, not a robbery, and you can infer that from the evidence because certainly they wouldn't be breaking into the Bell to wait six hours for the manager to appear."

We believe this, too, to have been within the realm of fair comment.

### 3

■ Calhoun further alleges:

"Prosecutor improperly testified to his intention of future prosecution of the State's witness Smallwood. The prosecutor told the jury that under no circumstances would it try Smallwood for murder, although the defense

contended that Smallwood participated in the murder. The prosecutor stated:

> It is the State's opinion, and of course that doesn't matter, because it is your opinion that matters, but it is the State's opinion that what Herbie Smallwood told you on the stand is the truth. *And the State has absolutely no intention, regardless of what you do with this defendant, of charging Smallwood with murder and trying him.* Does that make any sense at all after the witnesses we have paraded in before you, after the long, arduous testimony we have had you sit through, to just have done it on some kind of a lark, some kind of a whim? Sure, we will present evidence and if it turns out you don't believe us, then we will turn it around the next time." (Emphasis Calhoun's.)

Calhoun neglected to refer to the paragraph preceding that which he quoted:

> "This defense counsel feels free to comment about what the State is going to do with Herbie Smallwood, and I feel free to comment back to you about what the State intends to do with Herbie Smallwood."

This statement of the State was in obvious reply to defense counsel who had said:

> "Now, you remember the plea bargain has some unusual parts to it. And I don't mean the plea bargain as it affects the witness Smallwood. He has not yet been sentenced on the Montgomery County case.
>
> "Inference might be drawn from that they are waiting to see whether he is cooperative and to some extent that would have an impact on his testimony, maybe he would be able to use that in mitigating his sentence. I suggest to you that's not it. Because you will also know from the plea bargain that was read to you that there is still pending against him, Smallwood, there are the same charges pending against the defendant in this case. And that Smallwood can be prosecuted if it develops that Smallwood was found to be the one inside the W. Bell.

"I suggest to you, ladies and gentlemen of the jury, that the State may well be awaiting the outcome of this case; that when you return a verdict of not guilty as to the defendant, you have not set free the killer of Officer Metz. Herbie Smallwood can still be brought to justice and the killer of Officer Metz will not go free."

This was within the realm of fair comment.

### 4

Calhoun also claimed in his post-conviction petition:

"The prosecutor improperly invaded the court's province of instructing the jury as to fundamental principles of law governing the trial and improperly stated to the jury what the 'law' was as to a definition of proof beyond a reasonable doubt. The prosecutor stated:

I would like to read to you what the highest court of our State says about reasonable doubt, and to suggest to you that what Mr. Cromwell says it is is not quite what our highest court says it is. It is a very brief quote, and it is from Barry v. The State, Maryland, Page 62, the Maryland Court of Appeals. 'The trier of fact in a criminal case is enjoined by law to give due force to the perception of innocence and then to proceed cautiously in weighing the evidence. But he's not commanded to be naive and to believe without scrutiny every grim suggestion or far-fetched fairy tale whether emanating from the State or the defense. An indispensable ingredient in judgments in court as well as out of it is common sense. To prove guilt beyond a reasonable doubt it is not necessary that every conceivable miraculous coincidence consistent with innocence could be negative [sic]. They could not possibly meet their burden.' That is what they are saying reasonable doubt is; that we have to prove every possible coincidence consistent with innocence, we do not. That is not our burden."

This comment was made in response to the argument of defense counsel:

"Now, let me comment once more about reasonable doubt.

"Reasonable doubt often raises in one or two ways as a practical matter: either through the absence of proof, the absence of evidence that you can rely upon as one method or another method is that the proof is susceptible of two different interpretations, one consistent with guilt, one inconsistent with guilt. If you have that kind of proof, one consistent with guilt, one inconsistent with guilt, then you cannot return a verdict of guilty because the proof must exclude any reasonable possibility of criminal agency.

"If the proof is susceptible with two interpretations, one consistent with guilt and one inconsistent with guilt, then it doesn't meet the burden of proof. We believe the evidence in this case is of either of those two; it is not there or susceptible to two interpretations."

Prior to this statement by defense counsel, the State had only mentioned reasonable doubt in explaining the burden of proof as follows:

"The reason for that is that the State at all times in a criminal case, in every criminal case, bears the burden of proving the defendant guilty to each and every element beyond a reasonable doubt. Therefore, we have the opportunity for rebuttal, since we carry that burden. That burden of proof, beyond a reasonable doubt, is one that we gladly accept in this case; because we believe that we have demonstrated through our evidence overwhelmingly, not simply beyond a reasonable doubt, that this defendant is guilty of murder."

The court's instruction to the jury on reasonable doubt had been:

"In defining what is a reasonable doubt, it sometimes or often times becomes difficult of precise description because it is something that occurs or doesn't occur in the

minds of each juror, all of you collectively. It does not require that the defendant be found guilty or that you be convinced of his guilt beyond all doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence.

"A reasonable doubt is a doubt founded upon reason. It's not a fanciful doubt nor a whimsical, nor a capricious doubt. It is such a doubt as would cause a reasonable person to hesitate to act in the grave or important consequences of your own everyday life. Thus, if the evidence is of such a character as to persuade you of the truth of the charges against the defendant with the same force that would be sufficient to persuade you to act upon the abiding conviction of truth in a grave or more important transaction of your own life, you may conclude that the State has met its burden of proof beyond a reasonable doubt to a moral certainty, and it is your duty then to convict.

"If, however, you do not have such a conviction as to the defendant's guilt, then reasonable doubt exists and your duty would be to acquit or vote for not guilty."

The prosecutor's comments on rebuttal did not invade the province of the court in instructing the jury. He merely replied to a point raised by the defendant.

*5*

■ The final allegation by Calhoun on this issue was: "The prosecutor also urged improperly [to] the jury a different definition of premeditation:

Now, let's go to that point, premeditated murder. And I think the best way I can deal with it is to illustrate, to read from law. I know it puts everybody to sleep, but it is short, and I think really cogent to this point. This is a case called Robinson v. State, and it is from our Court of Special Appeals. They say, 'If the killing stems from a choice made as the result of thought, however short the struggle between the intention and

the act, it is sufficient to characterize the crime as a deliberate and premeditated murder.' It goes on to say that in this case, 'The Jury could have found intent to kill from the firing of two shots separate by an interval of time.' And they said that has been held to be sufficient evidence of deliberation and premeditation. That's exactly what we had here, two shots separated by an interval of time."

Defense counsel had discussed at length the concept of premeditation and deliberation. The preamble to that with which Calhoun takes issue is the preceding paragraph where the State said:

"And Mr. Townsend went to great lengths to make sure that you were at least confused about what constituted premeditated murder and why the similar way of dealing with the murder of Officer Metz was simply to call it a second degree murder if it was anything. What possible importance could that have for dealing with a man who was nowhere near the place."

The trial court had instructed the jury:

"The word premeditation as an element of first degree murder means planned, contrived, a scheme planned ahead of time before the commission of the fatal act. It means the entertainment in the mind of a fully formed purpose to kill with design to kill must have preceded the killing by a sufficient length of time, even though short, to show that the design to kill was deliberate, opportunity for reflection.

"It is not necessary that the premeditation or deliberation take any particular or appreciable length of time to be formed. In order to sustain a conviction of first degree murder as distinguished from first degree murder because of a felony murder, you must find beyond a reasonable doubt that it was an actual malicious intent, a fully performed purpose to kill with enough time for deliberation and premeditation to convince you that this purpose was not the immediate offspring of rashness or

impetuous temper, but that the mind had become fully conscious of its own design. Although design must precede the killing by some length of time, that time may not be long. The killing be not the instant effect of impulse, if there is hesitation or doubt to overcome, a choice made as a result of thought, however short, the struggle between the intention and the act, is sufficient to characterize the crime as murder in the first degree."

We do not find that what the State said contradicted that said by the court.

### 6

In sum, we agree with the State and the post-conviction judge that the issues are waived and that even if they were not waived there was no improper comment.

### (G) THE FECAL MATTER

Calhoun opens his brief on this issue by stating:

"During the sentencing phase of the trial the State introduced evidence regarding an allegation that Mr. Calhoun had sprayed contents of a bottle, apparently containing a mixture of human waste, on a correctional officer. Mr. Calhoun was never tried and convicted of any criminal offense arising from the alleged incident and it was stipulated below that any charges which could have been brought are now barred by the statute of limitations." (Reference to record extract omitted.) [2]

This incident and the record pertaining to it is discussed in *Calhoun*, 297 Md. at 596–601, 468 A.2d at 60–63. The objection made was, "It's no relationship to any of the specifications of aggravating circumstances under the circumstances." We pointed out that this was not a general

---

**2.** Under the heading of "consideration of improper aggravating circumstances" Calhoun in his petition for post-conviction relief mentioned other alleged improper evidence. The post-conviction judge did not deal with any other issues in his opinion. No other issues are presented to us. Hence, we deem them abandoned.

objection and hence under *von Lusch v. State,* 279 Md. 255, 264, 368 A.2d 468, 473 (1977), the right to challenge the evidence on other grounds was waived. We pointed out that this was not an objection on the grounds subsequently held in *Scott v. State,* 297 Md. 235, 465 A.2d 1126 (1983), to exclude evidence. We said:

> "In the absence of an objection focusing on the point before the Court in *Scott,* the evidence here was admissible under Art. 27, § 413(c)(1)(v), which permits introduction of, 'Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements.'" 297 Md. at 601, 468 A.2d at 62–63.

The post-conviction judge indicated that he disagreed with our assessment of the issue. However, he concluded his opinion by saying:

> "As the particular evidence admitted here was highly damaging to the petitioner (very possibly determinative of the ultimate issue) and as the particular evidence was clearly inadmissible in the sentencing hearing had a valid objection been lodged, this court would order the sentencing phase of petitioner's trial stricken but for the holding of a majority of the Court of Appeals that counsel failed to make an effective objection. The determination of the matter by the Court of Appeals is binding on this court. The matter has been finally litigated. This court so holds."

This issue has been finally litigated. Hence, under Code (1957, 1982 Repl.Vol.) Art. 27, § 645A(b) it is not subject to further review on post-conviction. However, there is yet additional reason to overrule this point. In *Huffington v. State,* 304 Md. 559, 500 A.2d 272 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986), we dealt with the issue of institutional history, which this incident was. We said in *Huffington:*

"The section of the presentence investigation report pertaining to institutional history states:

'On or about 12/6/83 the defendant, John Norman Huffington was cited for 1) refusing to obey a direct order and 2) creating a security threat. The defendant received ten days in disciplinary isolation for each of those infractions.

'Evidently the defendant offered resistance to Deputy Minnick while being searched. As to the second infraction the defendant apparently interfered with the searching of other inmates in the cell block.' "

304 Md. at 577, 500 A.2d at 281.

We referred to *Bartholomey v. State,* 267 Md. 175, 297 A.2d 696 (1972), involving the Maryland death sentence cases remanded to us by the Supreme Court of the United States for reconsideration in the light of its holding in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). We pointed out that in discussing the procedure to be followed by trial judges in resentencing those defendants Chief Judge Murphy said for the Court:

"[T]o aid the sentencing judge in fairly and intelligently exercising the discretion vested in him, the procedural policy of the State encourages him to consider information concerning the convicted person's reputation, past offenses, health, habits, mental and moral propensities, social background and any other matters that a judge ought to have before him in determining the sentence that should be imposed. *Skinker v. State,* 239 Md. 234, 210 A.2d 716 (1965); *Scott v. State,* 238 Md. 265, 208 A.2d 575 (1965); *Costello v. State,* 237 Md. 464, 206 A.2d 812 (1965); *Driver v. State,* [201 Md. 25, 92 A.2d 570 (1952)]; *Baker v. State,* [3 Md.App. 251, 238 A.2d 561 (1968)]. The sentencing judge may, but need not, obtain a presentence report under Article 41, § 124(b). Of course, the sentencing judge may take into consideration the defendant's conduct after the offense was committed, *viz.,* he may consider evidence of events occurring after the date of the original sentencing to whatever extent he may

deem necessary. *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *Purnell v. State*, [241 Md. 582, 217 A.2d 298 (1966)]; *Gatewood v. State*, 15 Md.App. 450, 291 A.2d 688 (1972)." 267 Md. at 193–94, 297 A.2d at 706. (Footnotes omitted.)

We referred to the more recent case of *Logan v. State*, 289 Md. 460, 425 A.2d 632 (1981), where Judge Digges said for the Court:

"In considering what is proper punishment, it is now well-settled in this State that a judge is not limited to reviewing past conduct whose occurrence has been judicially established, but may view 'reliable evidence of conduct which may be opprobrious although not criminal, as well as details and circumstances of criminal conduct for which the person has not been tried.' *Henry v. State*, 273 Md. 131, 147–48, 328 A.2d 293, 303 (1974)." 289 Md. at 481, 425 A.2d at 643.

We concluded:

"We are not concerned here with crimes, as in *Scott v. State*, 297 Md. 235, 465 A.2d 1126 (1983), with which an accused was charged but had not yet been convicted. We believe that under our prior cases this institutional history was properly admissible." 304 Md. at 578, 500 A.2d at 281.

██ The institutional infraction here was much more serious than that before the Court in *Huffington*. *Huffington* is further grounds for its admission.

### (H) INEFFECTIVE ASSISTANCE OF COUNSEL

Calhoun contends that trial and appellate counsel were ineffective. As to trial counsel he makes five claims: (1) failure to investigate and present mitigating evidence; (2) failure to object to improper evidence; (3) failure to object to improper argument; (4) failure to inform Calhoun of his right of allocution; and (5) failure to object to instructions

at sentencing. As to appellate counsel he claims error in failing to argue: (1) the issue of the selection of a prosecution-prone jury; (2) the failure of the trial court to excuse Calhoun from participating in suggestive in-court identification procedures; (3) the issue of failure to disclose grand jury testimony; (4) the issue of proper jury instructions; and (5) the question of improper closing argument at trial and sentencing.

### (1) THE LAW

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court said, "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–93. The standard for judging a claim of ineffective assistance of counsel was enunciated:

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

The defendant has a duty to show that counsel's representation fell below an objective standard of reasonableness. The Court cautioned against second-guessing an at-

torney's actions at trial with the benefit of hindsight. The Court said:

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac,* 456 U.S. 107, 133–134 [, 102 S.Ct. 1558, 1574–75, 71 L.Ed.2d 783, 804] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' See *Michel v. Louisiana,* [350 U.S. 91,] 101 [, 76 S.Ct. 158, 164, 100 L.Ed. 83, 93 (1955) ]." 466 U.S. at 689, 104 S.Ct. at 2065–66, 80 L.Ed.2d at 694–95.

\* \* \* \* \* \*

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial

testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

As the Court further said, "[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." 466 U.S. at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697. Moreover, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

Justice O'Connor emphasized for the Court that counsel's performance must be evaluated as a whole:

"The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

"In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a perva-

sive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." 466 U.S. at 695–96, 104 S.Ct. at 2069, 80 L.Ed.2d at 698–99.

The Court also said that the principles it had enumerated "do not establish mechanical rules," adding, "Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." 466 U.S. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699.

We analyzed and applied *Strickland* in *Harris v. State*, 303 Md. 685, 695–01, 704–23, 496 A.2d 1074, 1079–82, 1083–93 (1985), and have applied it more recently in *State v. Tichnell*, 306 Md. 428, 509 A.2d 1179 (1986).

## (2) TRIAL COUNSEL'S CONDUCT

### (a) THE FAILURE TO INVESTIGATE

■ Calhoun claims ineffective assistance of counsel because trial counsel failed to interview family members and other persons who knew him such as people at the University of the District of Columbia. As a result, there were no live witnesses at the penalty phase to present mitigating circumstances pertaining to Calhoun's background. Calhoun's aunt, Lulu Cordell, was the only witness interviewed. She was hospitalized at the time of trial. She had much to do with the rearing of Calhoun after he was abandoned by his parents. Trial counsel made arrange-

ments with the trial judge for the court and jury to go to the hospital to hear her testimony. At Calhoun's request this was not done. Her statement was read to the jury and then submitted as an exhibit.

Trial counsel never spoke to other members of Calhoun's family, even though his mother and a sister attended the trial. No efforts were made to contact people at the University of the District of Columbia where Calhoun had been a student.

Calhoun asserts to us:

"In short, the jury would have been presented with a fundamentally different view of James Calhoun than that which was presented. Rather than appearing as a 'cold', large, black man, the jury would have seen a person who had a pathetic and brutal upbringing; who struggled at a young age to support his sisters and their children; who turned to drugs to escape the reality of his life; who made attempts to educate and better himself; and who had offered a bond of compassion to those less fortunate."

As to the University of the District of Columbia witnesses, the post-conviction judge said:

"Its value at petitioner's sentencing is so negligible that it could not be considered as a factor affecting the outcome of the sentencing. Petitioner could have advised his trial counsel of the names of these persons if he believed they could give testimony of value in his behalf. Presumably, he did not do so because they did not occur to him as having testimony of value to give. Defense counsel can not be said to have failed in their duty by not locating such questionable witnesses in an independent investigation. In this respect it can be noted that the professor with whom the petitioner apparently had the most contact at the university—a Dr. Stuart—was unavailable to testify for 'personal reasons' in these post conviction proceedings when contacted by petitioner's post conviction counsel."

The post-conviction judge observed that since Calhoun's mother and sister attended the trial they "could have been called as witnesses had petitioner wished them to be called." He pointed out, however, that neither of these people "had much contact with petitioner in his teen years and thereafter." He further commented:

"In view of the attendance and presence of both at the trial, the conclusion reached here is that neither petitioner nor petitioner's trial counsel thought that the mother or the sister would be a helpful witness, if called. During these post-conviction proceedings the sister proved to be a mediocre witness with respect to her personality but an impressive witness as to early childhood events suffered by her and petitioner. As a witness, the mother's personality is substantially less than mediocre. However, she too testified to important facts concerning petitioner tending to establish both deprivation and abuse. Trial counsel might well have called the sister and the mother as witnesses trusting that the factual information would be significant and that the personality deficiencies would inure ultimately to the benefit not the detriment of petitioner. These, though, were tactical decisions to be made in consult with petitioner, and the failure to call the mother or the sister or both can not be called erroneous and falls far short of ineffective assistance."

We agree.

As to the written statement of the aunt, who did attend the earlier stages of the trial and, according to the post-conviction judge, "conferred frequently with counsel during recesses in the guilt-innocence stage," the post-conviction court commented, "Counsel did not create the unfortunate circumstance of Ms. Cordell's stroke, but it was through the effort and thorough preparation of counsel that her statement was available for consideration by the jury. In no way can this be said to be ineffective assistance."

On the issue of failure to investigate see *State v. Tichnell*, 306 Md. 428, 509 A.2d 1179 (1986), and *Harris v. State*, 303 Md. 685, 496 A.2d 1074 (1985).

### (b) THE OBJECTION TO THE FECAL MATTER

Calhoun claims ineffective assistance of counsel because his trial attorneys made an objection to the fecal matter issue which we deemed on the original appeal to be limited in scope. He asserts, "The Post-Conviction Court found that had counsel objected properly, the evidence would have been excluded and that its admission 'was critical and highly prejudicial' to Mr. Calhoun."

This contention must fall for two reasons. First of all, as *Strickland* makes plain, counsel must be judged upon the situation as it existed at the time of trial. We had not at that time decided *Scott*, 297 Md. 235, 465 A.2d 1126. There was no duty on counsel to foresee that we might hold as we held in that case. Secondly, as we have held in Part II(G) of this opinion, the objected to testimony was admissible as a part of institutional history as we held in *Huffington*, 304 Md. at 578, 500 A.2d at 281.

### (c) FAILURE TO OBJECT TO ALLEGEDLY IMPROPER ARGUMENT

We have considered all of these instances of allegedly improper argument in Part II(F) of this opinion and concluded that "there was no improper comment." It follows, therefore, that there could have been no ineffective assistance of counsel.

### (d) FAILURE TO INFORM CALHOUN OF HIS RIGHT OF ALLOCUTION

Calhoun claims ineffective assistance of counsel because he was not informed of his right of allocution. This was discussed in Part I(B) of this opinion where we deemed the point waived because there was no objection in the trial court. Calhoun claims that if he had been advised of his right to allocution he would have told the jury of the circumstances of his life which led to his criminal activity, his remorse, and his resignation to the fact that he would remain in prison for his natural life.

One of the trial attorneys testified that he and his co-counsel thought it best that Calhoun not testify at the

guilt/innocence phase of the trial because his visual appearance, which they labeled as scary or menacing, would leave a negative impression on the jury. In fact, he said he "was afraid that the visual impression would be so negative with the jury that they wouldn't even hear what he said, much less give it credibility, unfortunately." He testified that had he been aware of the right of allocution his position would have been the same.

In the post-conviction proceedings trial counsel stated that they did not interpret Code (1957, 1982 Repl.Vol.) Art. 27, § 413 as creating a right of allocution. As our holding in *Harris*, 306 Md. 344, 509 A.2d 120, clearly indicates, they were correct in this conclusion. As *Harris* indicates and as we have already said in Part I(B) of this opinion, there was a hiatus in our rules on the subject of allocution in capital cases between January 1, 1979, and July 1, 1984. The Maryland Rules just did not afford defendants in capital cases a right of allocution. It was the common law right of allocution which was in effect at the time of sentencing in this case. None of our cases so held until *Harris* was decided on May 23 of this year. Defense counsel was not obliged to anticipate our holding in *Harris*.

### (e) INSTRUCTIONS AT THE SENTENCING PHASE OF TRIAL

This allegation concerns the issues we shall discuss in Part II(I) of this opinion and the issue we discussed in Part I(A). Since we find no error on the part of the trial court, it follows that there was no ineffective assistance of counsel.

### (3) APPELLATE COUNSEL

Each of the issues on which it is asserted appellate counsel failed to give effective assistance has been discussed in other parts of this opinion and we have found no error.

### (4) THE DETERMINATION

The post-conviction judge summed up on this issue:

"In no way can it be said that Petitioner was denied the proper functioning of the adversarial process. Just the opposite—a full reading of the trial record here discloses that petitioner was the beneficiary of a fully dedicated effort by two superbly skilled trial attorneys raising on his behalf numerous difficult issues for adjudication and preservation on appeal. The State, itself represented by outstandingly skilled prosecutors, found its case continually tested by equally adept adversaries. In cross-examination alone there are frequent examples of hard hitting text book type interrogations using known facts skillfully to test a witness' knowledge, reliability, bias and truthfulness.

"There was no failure of the adversarial process here. This was a full scale battle joined. The trial judge, showing great skill and patience, was repeatedly met with novel and complex, not to mention difficult, issues. The extent of the battle joined and the commitment of Petitioner's counsel is exemplified by the fact that petitioner's counsel politely but firmly informed the trial judge and the state that they would incur possible contempt proceedings rather than participate in a trial if the petitioner was to be chained in leg irons in the courtroom.

\* \* \* \* \* \*

"Appellate counsel read every word of the trial transcript, met with Petitioner for consultations and prepared and filed an extensive brief. The appeal was handled skillfully and completely.

"One further comment with respect to the claim of ineffective assistance of counsel. One may ask how the judge, the prosecutors and the defense counsel failed to catch the matter of Audrey Neeley's grand jury testimony and the separate matter of allocution by the Petitioner. The answer lies not in a conclusion that there was no battle of effective adversaries. Rather, the answer is probably to be found in the broad sweep of the battle over many fronts during a period of time sufficient to tax and expend the energies of the participants, all of whom

were dedicated to giving their best. The record so reflects."

We bear in mind that in *Strickland* the Court said that "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." 466 U.S. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. Bearing this in mind and the fact that the Court indicated in *Strickland,* as we have already said, that the effectiveness of counsel must be "viewed as of the time of counsel's conduct," 466 .U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695, we find no ineffective assistance of counsel. In fact, it is our view that trial counsel and appellate counsel rendered most effective assistance. The numbers of claims they raised on behalf of their client is indicative of the fact that they were fighting at every turn to protect him to the best of their professional ability.

## (I) INSTRUCTIONS AT SENTENCING

Calhoun claims: (1) The trial court failed at sentencing to instruct the jury about its option to impose life notwithstanding its finding . that aggravating circumstances outweighed the mitigating circumstances; (2) it "failed to charge the jury that it must find beyond a reasonable doubt that death is appropriate under all the circumstances before that sentence is imposed"; (3) that it did not adequately describe to the jury the function of mitigating circumstances in the sentencing deliberations and what a mitigating circumstance is; and (4) that "the trial court by charging the jury. that they could consider whether or not Mr. Calhoun would be sentenced to life without parole under Article 27, Section 643(b), invited them to speculate on the issue of parole."

### (1)

■ The Maryland Capital Sentencing Statute embodied in Code (1957, 1982 Repl.Vol.) Art. 27, § 413 contemplates that after a sentencing authority has found aggravating and mitigating circumstances the sentencing authority shall

weigh those mitigating and aggravating circumstances. In fact, the caption to § 413(h) is "[w]eighing mitigating and aggravating circumstances." Section 413(h) states:

*"Weighing mitigating and aggravating circumstances.*—(1) If the court or jury finds that one or more of these mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the mitigating circumstances outweigh the aggravating circumstances.

"(2) If it finds that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death.

"(3) If it finds that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life."

Our statute was adopted to meet the objections found in death sentence statutes by the Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). It is the type of statute which met the approval of the Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). To instruct the jury as Calhoun desires about an "option to impose life notwithstanding its finding that aggravating circumstances outweighed the mitigating circumstances" would invite the unbridled discretion which the Court condemned in *Furman.* On this point, see *State v. Tichnell,* 306 Md. 428, 509 A.2d 1179 (1986). Thus, we see no error on this point.

(2)

In support of his proposition that the trial court erred by "fail[ing] to charge the jury that it must find beyond a reasonable doubt that death is appropriate under all the circumstances before that sentence is imposed," Calhoun cites *Chenault v. Stynchcombe,* 581 F.2d 444 (5th Cir.1978); *Goodwin v. Balkcom,* 684 F.2d 794 (11th Cir. 1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983), and the dissenting opinion of Justice Stevens respecting the denial of certiorari in *Smith v.*

*North Carolina,* 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982). We deem those cases inapposite. In *Foster v. State,* 304 Md. 439, 477, 499 A.2d 1236, 1255–56 (1985), *reconsideration denied,* 305 Md. 306, 503 A.2d 1326 (1986), we indicated that a preponderance of the evidence test was proper in weighing aggravating and mitigating factors. Judge Eldridge said for the Court:

> "As pointed out previously and in *Tichnell I* [*v. State*], 287 Md. [695,] 730, 415 A.2d 830[, 848 (1980)], this statutory language does not specify which side has the burden of proof or of persuasion. It does specify in paragraph (1) that the applicable standard is 'preponderance of the evidence' rather than 'beyond a reasonable doubt.' The 'preponderance of the evidence' test is normal when a court is weighing one set of circumstances against another. Ordinarily in such a balancing process, a court simply determines which side outweighs the other, without being concerned with how much or how clearly one side may outweigh the other. In *Tichnell I,* we did hold that, in this context, the 'beyond a reasonable doubt' standard was not required by *In re Winship, supra,* [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368], saying that the principles articulated in *Winship* and other cases 'do not require the prosecution . . . to prove *beyond a reasonable doubt* that the aggravating circumstances outweigh the mitigating circumstances.' 287 Md. at 731–732, 415 A.2d 830. We adhere to that view." 304 Md. at 477, 499 A.2d at 1255–56.

We continue to adhere to the view that the preponderance of the evidence is the proper test.

### (3)

■ Calhoun, citing *Spivey v. Zant,* 661 F.2d 464 (5th Cir.1982), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982), claims that the trial court did not adequately describe to the jury the function of mitigating circumstances in the sentencing deliberations and what a

mitigating circumstance is. More recently in *Peek v. Kemp*, 784 F.2d 1479 (11th Cir.1986), the court said:

"As stated at the outset, we continue to agree with our holding in *Spivey* that the jury instructions must guide and focus the jury's consideration of mitigating circumstances. Today, we elaborate on *Spivey* and hold that the Constitution requires that there be no reasonable possibility that a juror will misunderstand the meaning and function of mitigating circumstances, *i.e.*, that the law recognizes the existence of circumstances which in fairness or mercy may be considered as extenuating or reducing the punishment. What we reject is the notion that the Constitution requires that the jury instructions include any particular words or phrases to define the concept of mitigation or the function of mitigating circumstances. It is sufficient from a constitutional standpoint if it is clear from the entire charge considered in context that a reasonable jury could not have misunderstood the meaning and function of mitigating circumstances. To the extent that *Westbrook* [*v. Zant*, 704 F.2d 1487 (11th Cir.1983) ] and its progeny are inconsistent, those cases are overruled." 784 F.2d at 1494. (Footnotes omitted.)

The trial judge in his instructions to the jury said of the mitigating circumstances:

"[I]t is the burden of the defendant to establish the existence of one or more of the mitigating circumstances by the preponderance of the evidence that is, is something more likely so than not so. It was described to you by counsel as often used as the scales of justice. If they tip slightly in favor of one side, then your burden has been met."

He then proceeded to discuss each of the mitigating circumstances set forth in Code (1957, 1982 Repl.Vol.) § 413(g) which appear on the sentencing form provided pursuant to then Rule 772A(d) (now Rule 4–343(e)). After that he went through the procedure of advising the jury as to the manner of filling out the sentencing form.

As we said in *Calhoun,* 297 Md. at 640, 468 A.2d at 82, the sentencing jury set forth under "8," other mitigating circumstances, that it felt "that a substantial mitigating factor is the defendant's background, which has been such that he has never been integrated into society. Therefore, he has been and is unable to conform with its norms and moral values."

We believe the trial judge's instructions were clear and that the jury had no misunderstanding about mitigating circumstances as evidenced by its reference to other mitigating circumstances.

(4)

■■ Calhoun says that in *Poole v. State,* 295 Md. 167, 453 A.2d 1218 (1983), and *Shoemaker v. State,* 228 Md. 462, 180 A.2d 682 (1962), "Maryland courts have roundly condemned the mention of the possibility of parole or release on a life sentence during closing arguments." From this he asserts:

> "Manifestly, if it is improper for counsel to argue such matters, which occurred in this case, it is even more improper for the trial court to give instructions which would indicate to the jury that a defendant may be released. Here the trial court by charging the jury that they could consider whether or not Mr. Calhoun would be sentenced to life without parole under Article 27, Section 643(b), invited them to speculate on the issue of parole. As such, the jury was allowed to consider a factor which is arbitrary and not related to any matter properly before them." (References to record extract omitted.)

Code (1957, 1982 Repl.Vol.) Art. 27, § 643B provides for mandatory life sentence without the possibility of parole upon conviction a fourth time of any crime of violence by "[a]ny person who has served three separate terms of confinement in a correctional institution as a result of three separate convictions of any crime of violence...." Subsection (d) of § 643B provides that if the State intends to proceed against a person as a subsequent offender under

that section "it shall comply with the procedures set forth in the Maryland Rules for the indictment and trial of a subsequent offender." Pursuant to that provision and then Rule 734 (now Rule 4–245) notice had been given to Calhoun of the State's intention to seek a mandatory life sentence.

At the sentencing proceeding the defense introduced as an exhibit the notice from the State of its intention to seek a mandatory life sentence. No doubt defense counsel introduced this because they thought it would have a bearing on whether or not, in the words of Art. 27, § 413(g)(7), Calhoun "w[ould] engage in further criminal activity that would constitute a continuing threat to society." It was because of this exhibit that the trial judge instructed the jury:

> "In that regard, with [mitigating factor] number 7, an exhibit has been introduced, a Notice of Intention for the State to seek a life sentence without parole. There is a procedure separate and apart from the procedure before us today in which there is a determination under certain findings where that sentence may be imposed, that is, life imprisonment without parole. You may consider that only on the question of whether or not if the existence of that procedure makes it more or less likely that the defendant would engage in further criminal activity that would constitute a continuing threat to society."

Calhoun cannot now be heard to complain of an instruction which came about because of an effort of defense counsel to protect him.

### (J) ARGUMENT AT SENTENCING

Calhoun asserts that "the prosecutor's closing argument contained improper, irrelevant, inflammatory and prejudicial arguments which should not be made in a capital trial." He refers to three things. He objects because the prosecutor said, "Mr. Townsend, Mr. Cromwell, it says in the Bible: Death cometh, final, certain." Then he says that the State "improperly asked the jury to compare the circumstances of the death of the decedent to that of an execution

sanctioned by the law." Finally, he states that the prosecutor "improperly suggested to the jury that the petitioner may not actually serve a life sentence if it was imposed. He argued to the jury that the question of not being paroled was only 'a possibility' which the jury could not speculate on...." As to this last point, as we have just said under subsection (I) of this section of the opinion, it was the defense who introduced into evidence the issue of a possible mandatory life sentence. This argument was in evident response to that issue and we do not believe Calhoun can be heard to complain.

What the State said immediately after its reference to the inevitability and finality of death was:

"We would all, I am sure, like to choose the manner of our death. Peaceful perhaps, surrounded by loved ones, in the setting of tranquility without pain or suffering. Of course, we can't. Some have to face death in manners harsher than others. Phil Metz was one of those. Phil Metz faced death, suffered death, under as excruciating set of circumstances as one can possibly imagine. His life was taken from him unawares without a second ability to pause to reflect to know that he was to expire, left to die in a pool of blood and having a man stand over him and just executed him and proceeded to steal six thousand filthy dollars and run away."

 In subsection (F) of this section of the opinion we have quoted from *Wilhelm v. State,* 272 Md. 404, 412–13, 326 A.2d 707, 714 (1974), as to closing argument. It will be recalled that we there said that generally counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom and that the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of the witnesses which the prosecution produced. The argument as to the certainty of death did not exceed the bounds of fair comment.

 The argument where it is contended that the State improperly compared the circumstances of the death of the decedent to that of an execution sanctioned by law was as follows:

"You are here now to contemplate the death of another man, James Arthur Calhoun. His life won't be taken from him in that fashion. He has had the benefit of a fair and exhaustive trial submitted to 12 citizens of the community. He has had the opportunity to present his life to you. That determination is going to be made by calm deliberation among you ladies and gentlemen and decided according to the law, not based on a desire to inflict cruelty on any person. Phil Metz wasn't given that opportunity lying there in a pool of blood. James Arthur Calhoun is given that opportunity and will know the manner in which his death will come. Phil Metz's was undeserved; this man has forfeited his right to live among us under the law."

Counsel then went on to refer, although not by name, to *Furman v. Georgia* and the fault which the Supreme Court found "with all of the existing death penalty statutes in the United States." He explained, "The main reason for it was that juries were given unfettered discretion in deciding who should live and who should die." Counsel explained the Maryland Death Sentence Statute and the fact that "the scheme in Maryland [of] guided discretion consists of [the jury's] being required to identify certain aggravating factors and then balance them against any mitigating factors that may exist" and then "make an ultimate determination of whether the mitigating factors by a preponderance of the evidence would outweigh any aggravating factors which of course have to be proved beyond a reasonable doubt."

Placed in context the argument does not exceed the bounds of fair comment.

### (K) RECUSAL OF THE POST–CONVICTION JUDGE

Calhoun alleges:

"This case involved the killing of two persons, one of whom was a police officer of the Montgomery County Police Department. One basis for seeking the death penalty was that a law enforcement official had been killed in the course of his duties. Prior to the original trial, Mr. Calhoun's counsel filed a motion for an order disqualifying either the Honorable John F. McAuliffe or the Honorable James S. McAuliffe from participating in the proceedings upon information and belief that their father, now retired, had been the chief of the Montgomery County Police Department.

"The motion to recuse was renewed by written motion when the case was assigned to Judge [James S.] McAuliffe for post conviction proceedings. On October 22, 1984, over objection, Judge McAuliffe heard the motion. Counsel for Mr. Calhoun requested that another judge rule on the motion. Judge McAuliffe answered a number of inquiries by counsel and filed supplemental statements which revealed that (1) his father was the Chief of Police for Montgomery County for over 15 years; (2) he had other relatives, two cousins and an uncle, who served as law enforcement officials, one of whom was killed in the line of duty; and (3) during his consideration of the petition his cousin, who was once a police officer was shot and killed during a robbery." (References to transcript omitted.)

The post-conviction judge said:

"The matter of recusal is a serious matter. It asks this Court to step down from hearing this case. The Court has examined its conscience, did not ask for the case, does not want the case, in the sense that it does not want any case that ever deals with the life of a human being.

"When I took the oath of office, I understood that there were such cases out there and that someday I might be required to take one and maybe more. The case was assigned to me. I have no prejudice or bias against the Defendant in this case.

"I feel fully able to review the matters which are at hand and to make a determination under the law. Under the circumstances it seems to me that it would be inappropriate for me to recuse myself, although frankly there is a—there is a sort of an invitation from the side of me that says, take the easy way out. But, that is not what I agreed to do when I took this job. In short, the motion for recusal is denied."

 Calhoun first argues that the post-conviction judge erred in denying the request that the matter of recusal be heard by another judge, saying "Once a substantial question has been raised, the motion should have been heard by another judge. *C.f. Berger v. United States*, 255 U.S. 22 [, 41 S.Ct. 230, 65 L.Ed. 481] (1921) (federal statute requires that once affidavit containing facts sufficient to warrant recusal, motion should be granted)."

The Court opened its opinion in *Berger* by stating:

"Section 21 of the Judicial Code provides as follows:

" 'Whenever a party to any action or proceeding, civil or criminal, shall make and file an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against him or in favor of any opposite party to the suit, such judge shall proceed no further therein, but another judge shall be designated in the manner prescribed in the section last preceding, or chosen in the manner prescribed in section twenty-three, to hear such matter. Every such affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, ... No party shall be entitled in any case to file more than one such affidavit; and no such affidavit shall be filed unless accompanied by a certificate of counsel of record that such affidavit and application are made in good faith. The same proceedings shall be had when the presiding judge shall file with the clerk of the court a certificate that he deems himself unable for any reason to preside with absolute impartiali-

ty in the pending suit or action.' " 255 U.S. at 26–27, 41 S.Ct. at 231, 65 L.Ed. at 483.

The Court held:

"We are of opinion, therefore, that an affidavit upon information and belief satisfies the section and that upon its filing, if it show the objectionable inclination or disposition of the judge, which we have said is an essential condition, it is his duty to 'proceed no further' in the case." 255 U.S. at 35, 41 S.Ct. at 233, 65 L.Ed. at 486.

We do not have in force in Maryland a statute similar to 28 U.S.C. § 144 which requires that such a motion be heard by another judge. Hence, the argument that Judge McAuliffe should not have ruled upon the matter is without merit.

■■■ Calhoun next alleges that "because of Judge McAuliffe's familial ties to the Montgomery County Police Department, he erred in not granting the motion to recuse," citing ABA Standards, *The Function of the Judge* (1968), which states:

"The trial judge should recuse himself whenever he has any doubts as to his ability to preside impartially in a criminal case or whenever he believes his impartiality can be reasonably questioned."

In this instance the post-conviction judge had no doubt of his ability to preside impartially.

The background for disqualifying judges was recently commented upon by the Supreme Court in *Aetna Life Insurance Co. v. Lavoie,* —— U.S. ——, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986):

"[T]he traditional common-law rule was that disqualification for bias or prejudice was not permitted. See, *e.g., Clyma v. Kennedy,* 64 Conn. 310, 29 A. 539 (1894). See generally Frank, Disqualification of Judges, 56 Yale L.J. 605 (1947). As Blackstone put it, 'the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea.' 3 W. Blackstone, Commentaries *361. The more recent trend has been towards the adoption of statutes

that permit disqualification for bias or prejudice. See *Berger v. United States,* 255 U.S. 22, 31 [41 S.Ct. 230, 232, 65 L.Ed. 481] (1921) (enforcing statute disqualifying federal judges in certain circumstances for personal bias or prejudice). See also ABA Code of Judicial Conduct, Cannon 3C(1)(a) (1980) ('[A] judge should disqualify himself ... where he has a personal bias or prejudice concerning a party'). But that alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause." —— U.S. at ——, 106 S.Ct. at 1584, 89 L.Ed.2d at 832.

The State relies upon *Costello v. State,* 237 Md. 464, 206 A.2d 812 (1965). There a motion to disqualify was made after the trial and after the trial judge had considered the pre-sentence investigation. The judge insisted that an altercation between him and Costello's counsel had no effect on his action in respect to sentence. Judge Oppenheimer said for the Court:

"Nor do we agree with the appellant that the trial judge committed reversible error in refusing to disqualify himself. We have emphasized the fundamental principle that a judge shall not preside in any case unless he is disinterested and impartial. *Bd. of Medical Examiners v. Steward,* 203 Md. 574, 581, 102 A.2d 248 (1954) and cases therein cited. We have also held that we can not engraft upon our Constitution a provision that a judge is disqualified because he has expressed his opinion as to the case. *Co. Commrs. Charles Co. v. Wilmer,* 131 Md. 175, 180–181, 101 Atl. 686 (1917). In this case, the motion to disqualify was made after the trial had taken place before the judge involved and after he had considered a pre-sentence investigation made at his request. Judge Shure made it clear to the appellant in the hearing on the motion to reduce sentence that the unfortunate altercation between the judge and the appellant's counsel had no effect whatsoever on the judge's action in respect of the appellant's sentence. No corroboration of that statement is needed, but the nature of the sentence, in view of the

appellant's record and his offense, of itself indicates the dispassionate consideration which justice requires." 237 Md. at 473, 206 A.2d at 817–18.

The post-conviction judge referred to Canon 13 of the Canons of Judicial Ethics which provides:

"A judge should not act in a controversy in which a near relative is party, witness, or lawyer; he should not suffer his conduct to justify the impression that any person can improperly influence him or unduly enjoy his favor, or that he is affected by the kinship, rank, position, or influence of any party or other person. He should not testify voluntarily as a character witness."

He also referred to Rule 2 of the Rules of Judicial Ethics implementing that Canon which states:

"2. A judge shall not exercise his duties with respect to any matter in which a near relative by blood or marriage is a party, has an interest, or appears as a lawyer. He shall not participate in any matter in which he has a significant financial interest or in which he previously acted as a lawyer. For the purpose of this rule 'near relative' shall mean connection by consanguinity or affinity within the third degree, counting down from a common ancestor to the more remote."

Recusal would not have been required either by the canon or the rule.

In *Marzullo v. Kovens Furniture Co.*, 253 Md. 274, 252 A.2d 822 (1969), the plaintiff in a personal injury case wanted the judge to disqualify himself because the defendant was represented by the law firm in which the judge was once a partner and by which his son was then currently employed. We found the issue moot because the case had been removed from Baltimore City to Howard County for trial. However, we observed:

"If disqualification had to be discussed, we would say that under the circumstances there was no constitutional, legal or practical need for the judge not to sit in the case

and, having been within his rights in not disqualifying himself, ' * * * his action in that respect is not the subject of review.' *Ex Parte Bowles*, 164 Md. 318, 326 [165 A. 169]." 253 Md. at 276, 252 A.2d at 823.

*Ex Parte Bowles*, 164 Md. 318, 165 A. 169 (1933), involved an appeal from a finding of contempt. There the appellant had filed an affidavit claiming that the judge should be disqualified because his son was attorney for the son's father-in-law, a party to the case. The Court found that the judge had no interest within the meaning of Const. art. IV, § 7 which it defined as "having reference to a pecuniary interest in the litigation or the result thereof," nor was he connected with either of the parties by affinity or consanguinity within the prohibited degrees set forth in the Constitution and Code (1924) Art. 26, § 31. Judge W. Mitchell Digges said for the Court:

"There may be, and doubtless are, many circumstances in which a delicate sense of propriety would, and probably should, induce a judge to decline to sit in a given case and, upon his own motion or upon motion of either of the parties, remove the cause to another jurisdiction or request some other judge of the same jurisdiction to preside at the trial. However, if the presiding judge, under such circumstances, refuses to do this, he is within his legal rights; and his action in that respect is not the subject of review. Where the alleged disqualification does not amount to a constitutional or legal disqualification, the question is left to the enlightened conscience, delicacy of feeling, and sense of fairness possessed by the individual judge. The long and honorable history of the judiciary of this state impels the belief that the decision of such questions can be safely left where the responsibility now reposes. Judges are selected to be useful public servants, and no judge's view of the proprieties in such questions should be carried to such an extent as would result in the serious curtailment of his usefulness as a

public officer. We have always had, and will continue to have, situations where young men are practicing attorneys before the court presided over by their fathers; and what we have said is not to be construed as indicating a belief on the part of this court that justice, fairness, or delicacy of feeling should require, or even permit, the retirement of the judge in all such cases." 164 Md. at 326–27, 165 A. at 172.[3]

See also *Harper v. Harper*, 49 Md.App. 339, 342, 431 A.2d 761 (1981), *rev'd on other grounds*, 294 Md. 54, 448 A.2d 916 (1982). There the trial judge had met the appellee's wife once and knew that the daughter of the parties worked for a fellow judge. Relying upon *Marzullo*, 253 Md. 274, 252 A.2d 822, the Court of Special Appeals found no impropriety in the failure to recuse.

Countless times we have held jurors qualified when an impediment had been presented and the juror indicated that he or she could impartially decide the case without regard to that alleged impediment. In *State v. Hutchinson*, 260 Md. 227, 271 A.2d 641 (1970), the Court was concerned with "the question of whether or not the trial judge, sitting as a jury, erred in preliminarily admitting into evidence, over objections, the inculpatory statement of the accused obtained during a custodial interrogation and taken in violation of *Miranda* guidelines." The trial judge had subsequently rejected the statement at the close of trial and declared that he would completely disregard it in reaching a verdict. As Judge Finan put it for the Court:

"On appeal to the Court of Special Appeals the judgment was reversed and the case remanded for a new trial because, in the opinion of the court, the 'mere knowledge of the substance of the confession by the trier of the facts necessarily tended to deprive appellant [accused and

---

**3.** Under Rule 2 of the Rules of Judicial Ethics it is improper today for "young men [who] are practicing attorneys [to appear] before the court presided over by their fathers...."

appellee here] of his constitutional right to a fair trial.' "
260 Md. at 229, 271 A.2d at 642.

The Court said:

"This assumption of the court might be valid were we to first, not believe the trial judge's statement that he was disregarding and eliminating from his deliberations the substance of the inadmissible confession, and secondly, choose to ignore the professional expertise, experience, and judicial temperament with which our legal system has inherently invested a trial judge *vis a vis* a jury comprised of laymen. It is true that judges, being flesh and blood, are subject to the same emotions and human frailties as affect other members of the specie; however, by his legal training, traditional approach to problems, and the very state of the art of his profession, he must early learn to perceive, distinguish and interpret the nuances of the law which are its 'warp and woof.' " 260 Md. at 233, 271 A.2d at 644.

Given our prior cases, the fact that as in *Costello* the post-conviction judge ruled in favor of Calhoun as demonstrated by Part I of this opinion, our holdings relative to jurors, and our holding in *Hutchinson,* we find no error in the failure of the post-conviction judge to recuse himself.

### III

We conclude that the post-conviction judge erred on the issues which are before us on the State's appeal and he did not err on the issues before us on Calhoun's appeal.

ORDER OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY GRANTING A NEW CAPITAL SENTENCING PROCEEDING REVERSED; IN ALL OTHER RESPECTS, THE ORDER OF THAT COURT IS AFFIRMED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR THE PURPOSE OF ENTERING AN ORDER DENYING ALL POST–CONVICTION RELIEF TO JAMES ARTHUR CALHOUN.